[Cite as *State v. Webb*, 2023-Ohio-4817.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | APPEAL NO. C-220531 |
| | | TRIAL NO. 22CRB-11236 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| DE'ANGELO WEBB, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 29, 2023

*Emily Smart Woerner*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Victoria L. Lowry*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson*, Assistant Public Defender, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1} Following a bench trial in municipal court, defendant-appellant De'Angelo Webb was convicted of criminal trespass in violation of R.C. 2911.21(A)(1). Webb now appeals his conviction, raising a sole assignment of error for review that his conviction was based on insufficient evidence and against the manifest weight of the evidence. For the reasons set forth below, we overrule Webb's assignment of error and affirm his conviction.

### *Factual and Procedural Background*

{¶2} On July 4, 2022, the Cincinnati Center City Development Corporation ("3CDC") held a Fourth of July event in Washington Park. Washington Park is an outdoor public park owned by the city of Cincinnati. 3CDC hired off-duty Cincinnati police officers to serve as security during the event. These officers were hired to be visible, available and, if needed, provide medical treatment or respond quickly. The record established that these officers were authorized to remove people from the event for various reasons, including if they were intoxicated, under the influence of drugs, disputing or fighting, or becoming a distraction. Cincinnati Police Officer Jonathan Gordon was working on that detail for 3CDC that day with another officer. Officer Gordon used his body-worn camera to record events of the day.

{¶3} Around 3:20 p.m., Officer Gordon and another officer came upon De'Angelo Webb in a loud argument in the park with the mother of his children and in front of their three children. The entire incident was recorded on Officer Gordon's body-worn camera, and a review of the video shows that Webb remained in Washington Park despite numerous instructions to leave.

{¶4} The record is unclear as to the exact cause of the dispute. When the audio first began recording, the mother was sitting on a bench inside the park with her

2

three children and was telling Webb to gather his belongings and leave her house. Initially, Webb was standing away from the mother. Webb looped towards the mother and walked out of the park while the mother repeated three times to Webb to "get your shit and get out of my house[,]" and Webb replied each time, "say no more, say no more." Then, Webb stopped and turned back into the park as the mother repeated to Webb to "take your stuff and get out of my house." Webb insisted, "I don't care about none of that," while he leaned forward on the back of the bench the mother sat on. At that point, Officer Gordon and another officer intervened in the dispute, first telling the small children caught in the middle of the dispute to stay by the officers.

{¶5} As Officer Gordon addressed Webb, "Sir, sir," Webb stepped away from the mother, and Officer Gordon continued, "Yeah, thank you man, just some time and distance, y'all, time and distance, just some time and distance." Webb responded, "don't give a fuck about the police" and walked down the pathway towards the park exit. Webb walked about a third of the way down the path, when he turned and returned to the park. Officer Gordon stepped into Webb's way, saying "Sir, you're good, man, you all can just settle this later." Webb continued past Officer Gordon, who said "you're coming back? Don't come back! Don't come back. That's not worth it, man." Webb restarted the dispute, warning the mother twice that she "just fucked up." The mother did not respond.

{¶6} At that point, Webb turned and walked towards the park exit for the third time, making it all the way to the sidewalk of the street before stopping. Webb turned back into the park and declared, "I ain't going nowhere." Officer Gordon replied, "Sir, have a good day. It's not worth it." Webb retorted, "Nah, fuck all that, I ain't going nowhere." As Webb walked past Officer Gordon and turned in front of the

mother, Officer Gordon said, "Sir, you're done here. Just have a good day." The other officer, standing in front of the mother, told Webb, "She doesn't want to talk to you." All this time, the mother had sat silently on the bench. Webb replied, "I want to talk to her." Then Officer Gordon instructed, "Just have a good day, you're free to go."

{¶7}    Understanding that Officer Gordon was ordering him to leave the park, Webb questioned, "I ain't gotta leave, why I gotta leave?" Officer Gordon repeated his command, saying, "Yes you are, we're working in the park today and were not going to have this here." Unconvinced, Webb protested twice more, "Why I gotta leave?" Officer Gordon answered, "I'm asking you nicely, man." Webb replied, "I'm here with my kids." Officer Gordon pleaded again, "This fight is not worth it, man." Webb answered again, "I'm here with my kids." Officer Gordon responded, "This fight is never gonna stop. Have a good day sir." Webb then declared, "Not gonna tell me to leave this park."

{¶8}    At that point, Officer Gordon radioed to request an on-duty police cruiser to have "someone removed from the park so they do not return." Meanwhile, Webb pointed to the mother and said twice, "[y]ou done did that[,]" as he began to walk down the path out of the park. By this time, Webb had made three prior aborted exits. On his fourth exit, Webb walked to the sidewalk before shouting, "You did that, bruh. You done fucked up!" Officer Gordon stepped in Webb's way and attempted to wave Webb off. Undeterred, Webb declared, "You called the police on me one too many times, bruh! I should have beat your ass, bro! Real shit, bruh! And your daddy!" Each time, Officer Gordon said, "Have a good day." Webb turned, pointed again, and said "Your daddy, and your brother, and all of them."

4

{¶9} As Officer Gordon herded Webb along the path and towards the park exit, Webb shouted back into the park, "You a clown, bruh! You just did some clown shit! You just did some clown shit, bro! Real shit, bro! Real shit!" Officer Gordon pleaded with Webb, "Have a good day, sir. Have a good day." But Webb turned back, moving to reenter the park. Officer Gordon pleaded once more, "Have a good day, man, it ain't worth it, it ain't worth it, man. You've had every opportunity."

{¶10} Webb continued back into the park, arguing with Officer Gordon, "How can y'all kick me out of the park, from kicking with my kids?" Officer Gordon pleaded once more, "You've had every opportunity, sir, please just leave, please, you want nothing to do with this, just please leave." Undeterred, Webb replied, "I don't want nothing to do with it! I don't care about it! I'm kicking it with my kids, little brother. All this other shit you communicating can miss me, I don't care about none of that! I don't care about that extra shit, bro." As Webb argued, he continued walking back into the park towards his children and their mother.

{¶11} Webb picked up a bottle from the ground as he rounded the corner to face the mother of his children one more time. Officer Gordon walked behind him and another officer stood in between Webb and the mother, blocking his path. The other officer instructed, "Sir, we're not doing this. We're not doing this sir." "Not doing what?" Webb asked. "She doesn't want to talk to you right now[,]" answered the other officer. "Just have a good day, man[,]" Officer Gordon added, "[t]here's no need to keep coming back."

{¶12} Webb again declared, "I'm not going nowhere, I'm here in a public park with my kids" to which Officer Gordon replied, "You're gonna end up leaving[,]" and added, "Its not worth it." Seemingly convinced, Webb turned to leave the park,

5

pointed to the mother and said, "call your daddy, 'cause I'm about to call him" and he walked all the way out of the park. But Webb stopped in the crosswalk when he noticed the police cruiser that Officer Gordon requested earlier. Instead of continuing out of the park, Webb stepped back onto the curb towards the park and argued again with Officer Gordon. Webb asked, "[t]he fuck you gonna need this police shit for? Why you calling extra backup for?" Officer Gordon said once more, "I asked you to leave, man. Have a good day." Webb argued more and asked "Do you believe what this bitch has told y'all?" Officer Gordon said for a last time, "I asked you to leave, man," and he arrested Webb for criminal trespass.

{¶13} Webb was tried in a bench trial in municipal court. At trial, Officer Gordon testified that he "did not feel that [Webb] was going to calm down and not be a distraction at the event. Some of the language that he used was inappropriate as well." Though Officer Gordon describes Webb's conduct as disorderly, Officer Gordon did not state that he ordered Webb to leave for disorderly conduct nor did Officer Gordon arrest Webb for disorderly conduct.

{¶14} The municipal court convicted Webb of criminal trespass. The court sentenced Webb to pay a $50 fine and court costs. Webb now appeals his conviction.

### Law and Analysis

{¶15} In the sole assignment of error, Webb contends that his conviction was not supported by legally sufficient evidence and was against the manifest weight of the evidence. We confine our analysis only to the issues presented for review. Though Webb argued in part at trial that his conduct was speech protected by the First Amendment to the United States Constitution, Webb does not raise any constitutional issue in his appeal as an assignment of error or argue it in his brief. Accordingly, such

arguments are not properly before this court. *See* App.R. 12(A); *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 19. While a reviewing court may in its discretion consider constitutional challenges in specific cases of plain error, Webb does not argue such an error occurred. *See Quarterman* at ¶ 16, citing *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 377-378. When a party does not "undertake a plain-error analysis, an appellate court will not craft such an argument on his behalf." *State v. Chapman*, 9th Dist. Summit No. 28626, 2018-Ohio-1142, ¶ 23. Even if the application of the criminal-trespass statute to Webb was a constitutional violation, deciding such a constitutional question is better served with the benefit of briefing and argument. *Quarterman* at ¶ 19, quoting *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2. We have neither here.

### A. *Standard of Review.*

**{¶16}** A challenge to the sufficiency of the evidence supporting a conviction requires an appellate court to determine whether the state has met its burden of production at trial. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring). It is a question of law that we review de novo. *State v. Ellison,* 178 Ohio App.3d 734, 900 N.E.2d 228, 2008-Ohio-5282, ¶ 9 (1st Dist.). We must decide whether any rational trier of fact could have found the essential elements of the offense proved beyond a reasonable doubt after viewing the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of the witnesses. *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 45.

{¶17} By contrast, a challenge that a conviction is against the manifest weight of the evidence requires an appellate court to determine whether the state has met its burden of persuasion. *Thompkins*, at 390 (Cook, J., concurring). We "must review 'the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 59, quoting *Thompkins* at 387. However, an appellate court may not substitute its own judgment for that of the trier of fact "[w]here reasonable minds can reach different conclusions upon conflicting evidence." *Jenks*, at 279. An appellate court may only substitute its judgment for that of the trier of fact on the issue of witness credibility when "it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Porter,* 1st Dist. Hamilton No. C-200459, 2021-Ohio-3232, ¶ 25.

### B.  *Criminal Trespass*

{¶18} Webb was convicted of criminal trespass. To sustain a conviction for criminal trespass, the state must prove the defendant (1) without privilege to do so (2) knowingly (3) entered or remained on (4) the land or premises of another. R.C. 2911.21(A)(1). The third and fourth elements are not in dispute as Webb entered and remained in Washington Park, which is owned by the city of Cincinnati.

{¶19} The first element in dispute, a lack of privilege to be on the property of another, is the distinguishing characteristic between a criminal trespass and lawful presence. *State v. Staley*, 1st Dist. Hamilton Nos. C-200270, C-200271 and C-200272, 2021-Ohio-3086, ¶ 12. Generally, "a person has a privilege to enter and be upon the

8

public areas of public property." *State v. Shelton*, 63 Ohio App.3d 137, 578 N.E.2d 473 (4th Dist.1989). But "a trespass is not excused simply because the property involved is publicly owned." *Staley* at ¶ 12, citing R.C. 2911.21(B).

{¶20} A person may commit a criminal trespass onto public property when his or her general privilege to be there has been properly revoked. A " 'public official or agency[,] into whose charge the property is put[,] can withdraw or revoke the privilege otherwise enjoyed by a member of the public.' " *Id.* at ¶ 13, quoting *Dayton v. Moore*, 2d Dist. Montgomery No. 13369, 1993 Ohio App. LEXIS 1647 (Mar. 25, 1993). While R.C. 2911.21 does not require a particular basis to revoke an individual's privilege to be on public property, the public official must have a "reasonable and legitimate basis for withdrawing the privilege." *Id.* at ¶ 17, citing *City of Columbus v. Andrews*, 10th Dist. Franklin No. 91AP-590, 1992 Ohio App. LEXIS 829 (Feb. 27, 1992). If a " 'person charged with the supervision of public property acts unreasonably or exceeds the scope of his or her authority, the purported revocation of the privilege to enter the property is void and of no further effect.' " *Id.*, quoting *Andrews*. Whether there was a reasonable and legitimate basis to revoke the privilege is dependent on the facts and circumstances of each individual case.

{¶21} Here, the specific facts show Officer Gordon had a reasonable and legitimate basis to order Webb to leave. Webb was in Washington Park, a space that is owned by the city of Cincinnati, is open to the public, and is managed by 3CDC. Thus, Webb began with the general privilege enjoyed by all members of the public to be in the park. Officer Gordon testified he had the authority to withdraw that general privilege to be in Washington Park for various reasons, including if a person was intoxicated or under the influence of drugs, was involved in any kind of dispute or

fighting, or for being "a distraction at the event." Thus, the element is satisfied if Officer Gordon's revocation of Webb's privilege was reasonable and legitimate.

{¶22} Webb's general privilege to be in Washington Park is not boundless. When a person exceeds his privilege to be on public property, he commits a trespass. *See City of Cleveland v. Dickerson*, 2016-Ohio-806, 60 N.E.3d 686, ¶ 27 (8th Dist.). The park was hosting a Fourth of July celebration that day and it was reasonable and legitimate to remove Webb because he exceeded his privilege to be in the park and became a distraction to the smooth operation of the event. Officer Gordon asked Webb to leave on his own accord multiple times, advising Webb again and again that continuing the dispute at that time and place was not worth his time and energy. But Webb persisted each time, moving to leave at first, but then deciding to return time and time again. With each return, Webb escalated his words from name calling to invoking violence in front of two police officers. Webb said to the mother of his children, "I should have beat your ass, bro! * * * Your daddy, and your brother, and all of them!" because the mother of his children " * * * called the police on [Webb] one too many times!" By his conduct, Webb exceeded any privilege a member of the public had to be in the park. Webb was asked to leave the park multiple times and failed to do so.

{¶23} Being a "distraction" is not itself a trespass, nor do police automatically have a reasonable and legitimate basis to revoke the privilege of anyone who is being "distracting." Rather, Officer Gordon had a reasonable and legitimate basis to revoke Webb's privilege because of Webb's own conduct in the park and the distraction to the smooth operation of the event that his conduct posed.

**{¶24}** Although Webb was not charged with disorderly conduct, Webb's conduct can only be described as such. A cursory viewing of the body-worn camera recording shows Webb making "unreasonable noise or offensively coarse utterance[s], gesture[s], or display[s]," or "communicating unwarranted and grossly abusive language" to the mother of his children. *See* R.C. 2917.11(A)(2); *see also* Cincinnati Park Board Rule 27 (prohibiting disorderly conduct in Washington Park). This is not to say Officer Gordon must charge Webb with disorderly conduct to properly revoke Webb's privilege to be in the park. As the dissent correctly notes, the record is devoid of a specific rule that expressly prohibits "being a distraction" and if Webb was charged, it would be a different case that may involve First Amendment issues that are not currently before this court. Rather, this is to emphasize that there are general rules of conduct that inform when a person exceeds his general privilege to be on public property and inform when there is a legitimate and reasonable basis to revoke that privilege.

**{¶25}** Turning to the second element in dispute, whether Webb knowingly remained in Washington Park without privilege to be there. A person acts "knowingly" when, regardless of purpose, "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). A person has "knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.* An accused is presumed to intend the natural, reasonable and probable consequences of his voluntary acts. *State v. Morris*, 1st Dist. Hamilton No. C-150421, 2016-Ohio-5490, ¶ 9, citing *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978). As discussed previously, Officer Gordon properly revoked Webb's privilege to be in Washington Park and communicated that

11

to Webb multiple times. Webb understood Officer Gordon's three commands as ordering him to leave the park because Webb responded to the first order, "I ain't going nowhere[,]" then "I ain't gotta leave, why I gotta leave?" to the second and, "I'm not going anywhere[,]" to the third. This evidence, when viewed most favorably to the state, supports that Webb knowingly remained in Washington Park after his privilege to be there was lawfully revoked. *See Staley*, 1st Dist. Hamilton Nos. C-200270, C-200271 andC-200272, 2021-Ohio-3086, ¶ 21, ("[e]vidence that a guest was asked to leave the premises repeatedly and failed to make an effort to do so supports a conviction for criminal trespass."), quoting *State v. Tingler*, 7th Dist. Belmont No. 16 BE 0015, 2017-Ohio-4158, ¶ 11. Officer Gordon's orders and Webb's responses were all recorded on Officer Gordon's body-worn camera and the recording corroborated Officer Gordon's testimony so there were no credibility determinations nor conflicts of evidence where the trier of fact lost its way. *See id.* at ¶ 24.

{¶26} Accordingly, Webb's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. Consequently, we overrule Webb's assignment of error.

### Conclusion

{¶27} Having overruled the sole assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

ZAYAS, P.J., concurs.
BOCK, J., dissents.

12

**BOCK, J.**, dissenting.

{¶28} In my view, a contentious argument between parents in front of their children in a scarcely-populated public park is not a " 'reasonable or legitimate basis for withdrawing the privilege' " to remain on public property. *State v. Staley*, 1st Dist. Hamilton Nos. C-200270, C-200271 and C-200272, 2021-Ohio-3086, ¶ 17, quoting *City of Columbus v. Andrews*, 10th Dist. Franklin No. 91AP-590, 1992 Ohio App. LEXIS 829, 30 (Feb. 27, 1992). That is precisely the context in which off-duty officers revoked defendant-appellant De'Angelo Webb's privilege to remain in Washington Park with his children. Therefore, I respectfully dissent.

### *Webb argued with the mother of his children and Officer Gordon*

{¶29} A few facts warrant mentioning. Gordon's bodycam footage began as he approached Webb and the mother of his children. The footage shows a nearly empty park.



**{¶30}** While there is no audio at this point in the footage, the mother of Webb's children appeared to explain something to the officers. As the audio began, the children's mother can be heard repeatedly yelling at Webb, in front of their children, "Get your shit and get out of my house." She also yelled, "I don't give a fuck."

**{¶31}** After several minutes of arguing with his children's mother, leaving and reentering the park, and having words with Gordon, Webb asked, "Why I got to leave? Why I got to leave?" Gordon explained, "[W]e're working in the park today. We're not going to have this here. I'm asking you nicely." In response, Webb said, "I'm here with my kids, I'm here with my kids." Officer Gordon replied, "This fight is never going to stop."

### *Webb's privilege to be in the public park was improperly withdrawn.*

#### A. <u>Being a distraction does not</u> justify <u>revoking a person's privilege to be in a public place</u>

**{¶32}** In *Staley,* we recognized that the privilege to access public property, once granted, cannot be " 'withdrawn arbitrarily or capriciously.' " *Staley*, 1st Dist. Hamilton Nos. C 200270, C-200271 and C-200272, 2021-Ohio-3086, at ¶ 17, quoting *Andrews,* 10th Dist. Franklin No. 91AP-590, 1992 Ohio App. LEXIS 829, at 19. This principle reflects the fact that:

> persons charged with the supervision of public property * * * are not the actual owners of the property [and] have no right to exclude persons from the property for any reason or no reason at all. As public officers, they must act reasonably and within the scope of their authority. When a person charged with the supervision of public property acts unreasonably or exceeds the scope of his or her authority, the purported

14

revocation of the privilege to enter the property is void and of no further effect.

*Id.,* quoting *Andrews* at 31.

{¶33} The majority states, "Being a 'distraction' is not itself a trespass, nor do police automatically have a reasonable and legitimate basis to revoke privilege of anyone who is distracting. Rather, Officer Gordon had a reasonable and legitimate basis to revoke Webb's privilege because of Webb's own conduct in the park and the distraction to the smooth operation of the event that his conduct posed."

{¶34} As an initial matter, I see no difference between Webb "*being* a distraction" and Webb's conduct *causing* a "distraction to the smooth operation of the event that his conduct posed." Gordon testified that he removed Webb because of his belief that Webb would cause a distraction. The end result is the same—the majority holds that Webb's conduct created a distraction to the operation of the event, justifying his removal and criminal conviction.

{¶35} We are dealing with an alleged violation of a rule—but that rule does not exist. Contrast *Staley,* 1st Dist. Hamilton Nos. C-200270, C-200271 and C-200272, 2021-Ohio-3086, at ¶ 19 (reasonable and legitimate basis to withdraw the privilege where defendant was lying flat on a park bench in violation of a written park rule). Webb's causing a distraction in a public park is not a reasonable and legitimate basis to revoke his privilege to be in Washington Park. See *State v. Shelton*, 63 Ohio App.3d 137, 140, 578 N.E.2d 473 (4th Dist.1989) (Being "a nuisance" on public property is not by itself a reasonable and legitimate basis to revoke a person's privilege to be on that public property.) Punishing someone for conduct that is not expressly prohibited runs contrary to the very foundation of our criminal legal system.

15

{¶36} The majority fails to explain how a person's being a "distraction to the smooth operation of the event" can justify the state revoking that person's privilege to be in a public park.

{¶37} What exactly is a distraction? What is the legal test for a distraction? And as there is no rule defining a distraction, who decides what constitutes a distraction? Some people would say that a fan singing along to a live music performance is distracting because they came to hear the performer sing, not a fan. Is the fan's singing at a concert a distraction that justifies removal from a public place? Likewise, some people find children's laughter distracting. Can police remove families with laughing children from a public place during an event? How far does removing a person from a public place for "being a distraction" reach?

{¶38} The majority articulates no test whatsoever for what constitutes a distraction, which sets a dangerous precedent. The lack of a standard of conduct will permit an officer who simply wants someone to behave differently—regardless of whether that conduct violates any rule—to unilaterally label a person as a distraction and arbitrarily revoke the person's privilege to be in a public place.

### B. *Gordon arbitrarily removed Webb from the park*

{¶39} Gordon's revoking Webb's privilege for being a "distraction" was an arbitrary and improper exercise of authority.

{¶40} The majority opinion fails to explain at what point Webb's conduct justified Gordon's removal of Webb's privilege to remain in the public park. Was it when Gordon first instructed Webb to leave? Likely not. At this point, Webb's conduct is nearly identical to the mother of his children's conduct. Both were involved in their argument and used profanity in front of their children. Revoking Webb's privilege,

while permitting the mother of his children to remain in the park, cannot be considered anything but arbitrary. But as we recognized in *Staley*, the privilege to remain on property may not be withdrawn arbitrarily. *Staley*, 1st Dist. Hamilton Nos. C-200270, C-200271 and C-200272, 2021-Ohio-3086, at ¶ 17. Likewise, we recognized in Staley that an arbitrary revocation of privilege is an unreasonable exercise of authority, and in these instances, a " 'revocation of the privilege to enter [or remain on] the property is void and of no further effect.' " *Id.*, quoting *Andrews*, 10th Dist. Franklin No. 91AP-590, 1992 Ohio App. LEXIS 829, at 7.

{¶41} The majority appears to justify its holding that "[b]y his conduct, Webb exceeded any privilege a member of the public had to be in the park" by stating that Webb "escalated his words from name calling to invoking violence in front of two police officers." The majority opinion does not explain what precisely constitutes "invoking violence." This standard is concerningly nebulous, potentially encompassing protected expression, which would not justify revoking a person's privilege to enter and remain on public property. Significantly, Webb did not directly threaten the mother of his children. And while the majority opinion states, "Webb picked up a bottle from the ground as he rounded the corner to face the mother of his kids one more time," which may align with the notion that Webb's behavior was turning violent, the majority fails to mention that the "bottle" was, in fact, a baby bottle. Webb picked up his child's baby bottle and placed it in a wagon.

{¶42} Next, as the majority opinion acknowledges, Gordon explained at trial that he withdrew Webb's privilege because he anticipated that Webb *would be* a distraction during the Fourth of July event, not that he *currently was* a distraction. Gordon testified that he told Webb to leave because he was not "going to calm down

17

and not be a distraction at the event." But there is no authority suggesting that a person may be penalized for what a police officer believes will happen in the future.

**{¶43}** Finally, even if it were proper to revoke a person's privilege to be in a public place based on a nonexistent rule, I simply cannot fathom how Webb could have been a "distraction" to other park patrons when Washington Park was nearly empty, and the few people in the park appear unbothered by the couple's argument.



**{¶44}** To the extent that Webb's behavior would have distracted Gordon from ensuring the "smooth operation of the event," the officers were hired to handle these types of issues during the event. In the context of disorderly-conduct charges, courts have reasoned that, while "it might be reasonable to infer that an individual's yelling in an outdoor, public place may cause another inconvenience, annoyance, or alarm - we conclude that this is not a reasonable inference when the individual is an officer who must handle rowdy individuals on a daily basis." *State v. Smith*, 150 Ohio App.3d 45, 2002-Ohio-5994, 779 N.E.2d 776, ¶ 15 (2d Dist.); *see also State v. Miller*, 67 Ohio App.2d 127, 129, 426 N.E.2d 497 (3d Dist.1980) (complaint alleged that the defendant caused the deputy sheriff inconvenience "by engaging in turbulent behavior," but appellate court determined that "the altercation created not an inconvenience, but a job.").

**{¶45}** This was an argument between parents. While Webb's behavior may have been unpleasant, Webb's conduct did not justify Gordon's revoking Webb's privilege to be in a public place and did not justify a criminal conviction.

### *Webb did not engage in disorderly conduct.*

**{¶46}** While the majority explains that its analysis is confined "only to the issues presented for review," it nonetheless explores, in dicta, whether Webb's conduct "can only be described as" disorderly conduct under R.C. 2917.11(A)(2). To that end, the majority references Cincinnati Park Board Rule 27 ("Rule 27"), which prohibits disorderly conduct. But the record reflects that neither R.C. 2916.11(A)(2) nor Rule 27 formed Gordon's basis for revoking Webb's privilege.

### A. *Failure to abide by "general rules of conduct" cannot support a criminal conviction*

**{¶47}** The majority explains that its disorderly-conduct analysis serves to merely emphasize Gordon's "legitimate and reasonable basis" for withdrawing Webb's privilege and highlights "that there are general rules of conduct that inform when a person exceeds their general privilege to be on public property."

**{¶48}** Webb's loss of privilege to be at Washington Park formed the basis for his trespass conviction. Justifying a conviction based on "general rules of conduct" is deeply troubling. It is true that our civil legal system permits factfinders to consider "general rules of conduct," along with other factors, to determine whether a party exercised due care. *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 567 N.E.2d 1291 (1991). But it is foundational to our justice system that the United States Constitution "requires that each element of a crime be proved to the [fact finder] beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 104, 133 S.Ct. 2151, 186

19

L.Ed.2d 314 (2013). Permitting the state to revoke a person's privilege to be in a public place—and thus, imposing criminal liability on that person for trespass—based on some vague "general rules of conduct" cannot be constitutionally valid. No one should incur criminal liability or be deprived of their freedom based on failing to abide by "general rules of conduct."

### B. *Webb's expression is protected by the First Amendment*

{**¶49**} The majority states, "Even if the application of the criminal-trespass statute to Webb was a constitutional violation, deciding such a constitutional question is better served with the benefit of briefing and argument." But the majority opinion invokes the disorderly-conduct statute. And when a disorderly-conduct law targets the content of a defendant's expression, precedent dictates that a court " 'must apply a First Amendment analysis to ensure that the defendant's right to free speech is not being infringed.' " *City of Parma v. Kannenberg*, 8th Dist. Cuyahoga No. 100370, 2014-Ohio-5681, ¶ 30, quoting *Fairborn v. Grills*, 2d Dist. Greene No. 92 CA 92, 1994 Ohio App. LEXIS 2467, 5 (June 8, 1994).

{**¶50**} R.C. 2917.11(A)(2) prohibits a person from "recklessly caus[ing] inconvenience, annoyance or alarm to another" by "[m]aking unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person."

{**¶51**} Had Webb been charged with disorderly conduct, the evidence would have been insufficient to support a conviction.

{**¶52**} The First Amendment to the United States Constitution protects freedom of speech. This protection, however, is not absolute. *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 791, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011). There are

a few "historic and traditional" categories of speech which may be regulated and punished, including (1) incitement; (2) obscenity; (3) defamation; and (4) "fighting words." *Id*. As explained by this court, citing the Ohio Supreme Court, "a person may not be found guilty of disorderly conduct under subsection (A)(2) unless the words spoken are 'fighting words.' " *Staley*, 1st Dist. Hamilton Nos. C-200270, C-200271 and C-200272, 2021-Ohio-3086, at ¶ 26, citing *State v. Hoffman*, 57 Ohio St.2d 129, 133, 387 N.E.2d 239 (1979), paragraph one of the syllabus.

{¶53} "Fighting words" are those that "by their very utterance inflict injury or are likely to provoke the average person to an immediate retaliatory breach of the peace." *Cincinnati v. Karlan*, 39 Ohio St.2d 107, 110, 314 N.E.2d 162 (1974). In other words, the record must demonstrate that the speech either inflicted injury upon the listener or that the words would likely provoke a person to immediately retaliate, breaching the peace. *Hoffman* at 133.

{¶54} Profane and offensive language is protected First Amendment speech. *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). In this regard, "[s]tandards of decorum have changed dramatically since 1942, moreover, and indelicacy no longer places speech beyond the protection of the First Amendment." *Greene v. Barber*, 310 F.3d 889, 895 (6th Cir.2002). Thus, a person's use of profanity is insufficient to support a disorderly-conduct conviction. *In re Fechuch*, 5th Dist. Tuscarawas No. 2005 AP 02 0012, 2005-Ohio-4342, ¶ 39 (appellant calling two women "fucking bitches" and "flipping them off" was insufficient to support a disorderly-conduct conviction because the women were not injured and did not retaliate with a breach of the peace); *State v. Gatto*, 6th Dist. Ottawa No. OT-06-033, 2007-Ohio-4609, ¶ 2 (Defendant's yelling at a driver to "Go fuck yourself" and "[t]ake

the fucking radio and stick it up your fucking ass" did not support a disorderly-conduct conviction because the driver, while upset and surprised, was not incited to violence.).

**{¶55}** Webb's language may have been rude. But "rude, abusive, offensive, derisive, vulgar, insulting, crude, profane or opprobrious spoken words * * * may not be made a crime unless they are 'fighting words.' " *Hoffman*, 57 Ohio St.2d 129, 131, 387 N.E.2d 239. Webb's speech did not constitute "grossly abusive language" or "offensively coarse utterance[s]." *See* R.C. 2917.11(A)(2). The profanity used by Webb—and by the mother of his children—is protected First Amendment speech. And there is no evidence that Webb's speech provoked, or was likely to provoke, an immediate retaliatory breach of the peace.

**{¶56}** While Webb said to the mother of his children that he should have "beat your ass," this cannot reasonably be construed to constitute a threat of violence. Webb did not threaten to "beat" the mother of his children; instead, he lamented that he should have done so. While unpleasant, these words were not a threat. And the mother of his children *never reacted* to his statement, even when he returned to her vicinity. While " 'a person need not actually be provoked to a violent response' for words to be 'fighting words,' the failure of the targeted party to respond might evidence that the words were not 'fighting words.' " *State v. Gibson,* 3d Dist. Union No. 14-23-01, 2023-Ohio-2202, ¶ 15 (collecting cases), quoting *State v. Blair,* 2d Dist. Montgomery No. 24784, 2012-Ohio-1847, ¶ 9.

**{¶57}** Webb's conduct could not support a disorderly-conduct conviction. And it cannot be the basis for revoking Webb's privilege to be in a nearly empty public park.

### *Conclusion*

**{¶58}** I believe that Gordon's revoking Webb's privilege to remain in a public park with his children was an arbitrary and unreasonable exercise of authority. Permitting officers to remove people from public spaces based on an argument between parents, profanity, and what the officer believed would happen in the future goes far beyond our holding in *Staley* and creates a slippery slope where officers can remove people from public places simply because they do not like what they are saying. And justifying his conviction in any manner by saying that Webb violated "general rules of conduct" runs contrary to very foundation of our justice system.

**{¶59}** I would therefore sustain Webb's assignment of error and reverse his conviction. I dissent.

Please note:

The court has recorded its entry on the date of the release of this opinion.